*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PRECISION SURGICAL ASSOCIATES, PC,
INSIGHT ANESTHESIA, PLLC, ALLIANCE
ANESTHESIA, PLLC, INTEGRATED HOSPITAL
SPECIALISTS, PC, and TIA R. SCOTT,

      Plaintiffs-Appellees,

UNPUBLISHED
April 27, 2026
10:18 AM

v

AUTO CLUB INSURANCE ASSOCIATION,

      Defendant-Appellant.

No. 369750
Oakland Circuit Court
LC No. 2022-197116-NF

---

Before: LETICA, P.J., and RICK and BAZZI, JJ.

PER CURIAM.

Defendant, Auto Club Insurance Association, appeals by leave granted[1] an order denying its motion for summary disposition under MCR 2.116(C)(7) (claim barred by prior payment) and MCR 2.116(C)(10) (no genuine issue of material fact), in this action filed by plaintiffs, Precision Surgical Associates, PC (Precision), Insight Anesthesia, PLLC (Insight), Alliance Anesthesia, PLLC (Alliance), and Integrated Hospital Specialists, PC (Integrated Specialists). Because this matter is governed by *Favot*,[2] we affirm in part, reverse in part, and remand.

## I. BASIC FACTS AND PROCEDURAL HISTORY

This action arises from plaintiffs' pursuit of reimbursement from defendant for medical services provided to the underlying insured, Tia R. Scott, under the no-fault act, MCL 500.3101 *et seq*. Scott was injured in a car accident in December 2021. She was insured under a policy issued by defendant at that time. In July 2022, Scott had surgery for injuries sustained in the car accident.

---

[1] *Precision Surgical Assoc PC v Auto Club Ins Ass'n*, unpublished order of the Court of Appeals, entered September 20, 2024 (Docket No. 369750).

[2] *Favot v Brown*, ___ Mich App ___; ___ NW3d ___ (2025) (Docket Nos. 368733 and 368734), lv pending.

Scott's medical care was provided by plaintiffs, and she in turn assigned plaintiffs her right to reimbursement for medical services rendered.

Alliance and Insight each billed $18,900 for code 00670, anesthesia, for extensive spinal cord procedures performed during Scott's surgery. Defendant paid $583.13 to each plaintiff for these services, noting that the procedures were conducted by a certified registered nurse anesthetist (CRNA) under the direction of a physician. Integrated Specialists billed $1,155 for codes 99254, inpatient consultation, 99231, subsequent day of hospital care, and 99238, hospital discharge day management, for services rendered on the day of Scott's surgery and during a two-day hospital stay that followed. Defendant denied the billing for the 99254 service, noting that Integrated Specialists was required to submit a charge description master for consideration of the charge. Defendant paid $78.47 for the 99231 service and $143.99 for the 99238 service, stating that those amounts were based on the Medicare Part B fee schedule for participating practitioners, in accordance with MCL 500.3157.

Precision billed $30,461.40 for codes 22633, arthrodesis, 63052, laminectomy, facetectomy, or foraminotomy during arthrodesis, 22853, insertion of interbody biomedical device, 22840, posterior nonsegmental instrumentation, 15200, full thickness graft, 20936, autograft for spine surgery, and 20930, placement of osteopromotive material for spine surgery. All the codes were noted as having a physician assistant, nurse practitioner, or clinical nurse specialist assisting during surgery. Defendant paid $550.27 for the 22633 service, $77.24 for the 63052 service, $77.09 for the 22853 service, and $226.35 for the 22840 service, reiterating that those amounts were based on the Medicare Part B fee schedule for participating practitioners, consistent with MCL 500.3157, and adjusted based on the guidelines for a nonphysician assistant surgeon. Defendant denied the billing for the 15200 service on the ground that Medicare guidelines indicate that an assistant at surgery may not be paid. Defendant denied the billing for the 20936 and 20930 services on the ground that Medicare designates them as bundled codes, explaining that that "[p]ayment for covered services are [sic] always bundled into payment for other services not specified," and that "[w]hen these services are covered, payment for them is subsumed by the payment for the services to which they are incident."

Plaintiffs filed a complaint against defendant, alleging that defendant unreasonably refused or delayed paying them for Scott's no-fault personal protection insurance (PIP) medical benefits in the following amounts: $29,530.45 to Precision, $18,316.87 to Alliance, $18,900 to Insight, and $1,155 to Integrated Specialists.

During these proceedings, defendant moved for summary disposition under MCR 2.116(C)(7) and (C)(10), arguing that plaintiffs were not entitled to additional payment because defendant had paid them 195% of the "amount[s] payable . . . under Medicare," as provided as the applicable reimbursement cap in MCL 500.3157(2)(b). Defendant asserted that the definition of "Medicare" provided in MCL 500.3157(15)(f)[3] excludes from consideration only

---

[3] MCL 500.3157(15)(f) states as follows:

> "Medicare" means fee for service payments under part A, B, or D of the
> federal Medicare program established under subchapter XVIII of the social security

limitations *unrelated* to the rates in the fee schedule. Defendant reasoned that the limitations it applied in this case were *related* to the rates in the fee schedule and were properly applied in determining the amount that Medicare would pay for the services at issue.

Defendant additionally contended that these "related" limitations included reductions from the rates paid to a physician when a nurse practitioner, physician's assistant, or other nonphysician provided the service, and bundling codes to a single rate. Specific to the anesthesia services provided by Alliance and Insight, defendant cited the Medicare Claims Processing Manual (MCPM)[4] as stating that anesthesia services provided by a nonphysician are reimbursable at 50% of the rate for a physician found in the fee schedule. Defendant explained its calculation as follows:

> The base units and conversion factor are available on the CMS website at: https://www.cms.gov/Center/Provider-Type/Anesthesiologists-Center.html. The anesthesia conversion factor for 2022 is $22.40. The allowable base units for CPT code 00670 is 13. Accordingly, the amount payable under Medicare requires the following calculation:
>
> (Base unit of 13 + 13.7 anesthesia time actually billed) x (conversion factor of $22.40)
>
> 26.7x $22.40 = $598.08.
>
> We then take 50% of $598.08 since the services were performed by a CRNA at the direction of the physician. The amount is now: $299.04.
>
>  . . . Applying the 195% multiplier under MCL 500.3157(2), $299.04 x 195% equals $583.128.

Specific to the hospitalization services provided by Integrated Specialists, defendant cited the Medicare Physician Fee Schedule (MPFS), with no limitation applied. Defendant outlined its calculation of the no-fault reimbursement cap as follows:

---

act, 42 USC 1395 to 1395*lll*, without regard to the limitations unrelated to the rates in the fee schedule such as limitation or supplemental payments related to utilization, readmissions, recaptures, bad debt adjustments, or sequestration.

[4] See Centers for Medicare & Medicaid Services, *Medicare Claims Processing Manual*, Chapter 12 <https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/clm104c12.pdf> (accessed August 20, 2025).

The amount payable under Medicare's Physician Fee Schedule for 99231 is $40.24. Applying the 195% multiplier under MCL 500.3157(2)(a), Defendant paid [$78.47].[5]

Next, Plaintiff Integrated's charged of [sic] code 99238 is payable under Medicare's Fee Schedule at $73.84. Applying the 195% multiplier, Defendant paid Plaintiff Integrated $143.99.

Specific to the surgery services provided by Precision, defendant cited the MPFS for the four procedure codes that it paid, with the application of an assistant-at-surgery limitation from the MCPM. Defendant outlined its calculation of the no-fault reimbursement cap as follows:

Plaintiff Precision's charged code of 22633 is payable under Medicare's Fee Schedule at $2,074.94. Applying the 195% multiplier, this comes to $4,046.13. However, Medicare places a limitation on assistants-at-surgery. Pursuant to Section 120.1 of the [MCPM], when, as is here, a Nurse Practitioner assists in a surgical procedure, those services are paid at 80% of the lesser of the actual charge or 85% of the 16% that a physician is paid as an assistant at surgery [sic] under the Medicare Physician Fee Schedule. Defendant applied the assistant at surgery [sic] limitation with the following calculation: $4,046.13 x 85% = $3,439.21 x 16% = $550.27, which Defendant paid to Precision.

Plaintiff Precision's charged code of 63052 is payable under Medicare at $291.25. Applying the 195% multiplier, this comes to $567.94. Defendant applied the assistant-at-surgery limitation with the following calculation: $567.94 x 85% = $482.75 x 16% = $77.24, which Defendant paid to Precision.

Plaintiff Precision's charged code of 22853 is payable under Medicare at $290.69. Applying the 195% multiplier, this comes to $566.85. Defendant applied the assistant-at-surgery limitation with the following calculation: $566.85 x 85% = $481.82 x 16% = $77.09, which Defendant paid to Precision.

Plaintiff Precision's charged code of 22840 is payable under Medicare at $853.49. Applying the 195% multiplier, this comes to $1,664.31. Defendant applied the assistant-at-surgery limitation with the following calculation: $1,664.31 x 85% = $1,414.66 x 16% = $226.35, which Defendant paid to Precision.

Defendant cited the "assistant at surgery" field of the MPFS for the skin graft-code as indicating that an assistant at surgery is not paid under Medicare for this procedure. Defendant

_____

[5] Defendant's brief in support of its motion for summary disposition gave the amount it paid for code 99231 as $73.47. However, the calculation described ($40.24 x 1.95) indicates that the correct amount is $78.47.

cited the MPFS and the MCPM[6] indication of "Status B" as the reason for denial of the two remaining codes, 20930 and 20936, which were add-on services during spine surgery. Defendant elaborated that a "Status B," or bundled, procedure indicates payment for this code is subsumed by the payment for services to which the procedure is incidental.

Plaintiffs responded that, although the MCL 500.3157(2)(b) fee schedule applies to the benefits at issue, the no-fault act requires that only the Medicare rates be considered in the calculation of the no-fault reimbursement cap, not the Medicare rules, and the rates alone must be multiplied by 195%. If that calculation was applied, plaintiffs maintained that the total of their claims of PIP benefits for Scott's care was $30,444.68. Plaintiffs explained that defendant paid only $1,736.54,[7] leaving $28,708.14 owing. Plaintiffs contended that defendant's explanation of the fees owed contradicted MCL 500.3157. In support of that argument, plaintiffs pointed to a ruling of the Department of Insurance and Financial Services (DIFS), which held that Medicare rules do not apply to the calculation of no-fault reimbursement caps. Plaintiffs also maintained that the DIFS had expressed an expectation that insurers applying the 2019 amendments would cooperate with providers regarding the proper coding of services to ensure appropriate compensation. Finally, plaintiffs contended that MCL 500.3157(15)(f) clearly indicates that only the base rates from the fee schedule are to be considered in the calculation of the no-fault reimbursement caps.

The trial court denied defendant's motion for summary disposition. The court agreed with plaintiff's argument that the Legislature only intended for the Medicare fee schedule to apply to rates, not to the total amounts that automobile insurers were required to pay out on claims for PIP benefits. The court thus concluded that genuine issues of material fact remained regarding the amounts that defendant owed to plaintiffs. This appeal followed.

## II. ANALYSIS

Defendant argues that the trial court erred by denying its motion for summary disposition under MCR 2.116(C)(7) and (C)(10). Defendant maintains that certain amendments to the no-fault act clearly indicate that the Legislature intended for Medicare payment methodologies to be incorporated into the act. Defendant claims that the Medicare rate limitations and adjustments related to the Medicare fee schedule rates apply to claims for no-fault PIP benefits. Defendant also maintains that it paid plaintiffs what they were owed—that is, 195% of what Medicare would pay for the applicable services. In light of this Court's recent ruling in *Favot*, ___ Mich App at ___; slip op at 7-8, we agree with defendant in part.

---

[6] See Centers for Medicare & Medicaid Services, *Medicare Claims Processing Manual*, Chapter 23, § 30.2.2 <https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c23.pdf> (accessed August 20, 2025).

[7] Plaintiffs' accounting of defendant's payments differs from defendant's calculation by $583.13. Defendant has record of making a $583.13 payment to each anesthesia provider (Insight and Alliance), while plaintiffs' ledger includes only one of these payments.

This Court reviews a trial court's ruling on a motion for summary disposition de novo. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). "MCR 2.116(C)(7) permits summary disposition because of release, payment, prior judgment, or immunity granted by law." *Clay v Doe*, 311 Mich App 359, 362; 876 NW2d 248 (2015) (quotation marks, brackets, and citation omitted). When ruling on a (C)(7) motion, "a trial court should examine all documentary evidence submitted by the parties, accept all well-pleaded allegations as true, and construe all evidence and pleadings in the light most favorable to the nonmoving party." *McLain v Lansing Fire Dep't*, 309 Mich App 335, 340; 869 NW2d 645 (2015). "The moving party may support its motion for summary disposition under MCR 2.116(C)(7) with affidavits, depositions, admissions, or other documentary evidence, the substance of which would be admissible at trial." *Odom v Wayne Co*, 482 Mich 459, 466; 760 NW2d 217 (2008) (quotation marks and citation omitted).

A motion under MCR 2.116(C)(10) "tests the factual sufficiency of a claim." *El-Khalil*, 504 Mich at 160 (citation and emphasis omitted). In considering a motion under MCR 2.116(C)(10), the "trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *Id*. The motion "may only be granted when there is no genuine issue of material fact." *Id*. "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id*. (quotation marks and citation omitted).

To the extent that this case involves questions of statutory interpretation, we likewise review such matters de novo. *Makowski v Governor*, 317 Mich App 434, 441; 894 NW2d 753 (2016).

This Court has stated that the purpose of the no-fault act is to provide assured, adequate, and prompt reparation for certain economic losses to victims of automobile-related accidents. *Gauntlett v Auto-Owners Ins Co*, 242 Mich App 172, 179; 617 NW2d 735 (2000). In part, the intent of the act is to minimize administrative delays and factual disputes that would interfere with this purpose. See *Miller v State Farm Mut Auto Ins Co*, 410 Mich 538, 568; 302 NW2d 537 (1981). The no-fault act was most recently amended in 2019. See 2019 PA 21. As part of the 2019 legislation, MCL 500.3157 was amended to add Subsections (2) to (15), which state, in relevant part:

> (2) Subject to subsections (3) to (14), a physician, hospital, clinic, or other person that renders treatment . . . to an injured person for an accidental bodily injury covered by personal protection insurance is not eligible for payment or reimbursement under this chapter for more than the following:
>
> (a) For treatment or training rendered after July 1, 2021 and before July 2, 2022, 200% of the amount payable to the person for the treatment or training under Medicare.
>
> (b) For treatment or training rendered after July 1, 2022 and before July 2, 2023, 195% of the amount payable to the person for the treatment or training under Medicare.

(c) For treatment or training rendered after July 1, 2023, 190% of the amount payable to the person for the treatment or training under Medicare.

\* \* \*

(7) If Medicare does not provide an amount payable for a treatment . . . under subsection (2) . . . the physician, hospital, clinic, or other person that renders the treatment . . . is not eligible for payment or reimbursement under this chapter of more than the following, as applicable:

(a) For a person to which subsection (2) applies, the applicable following percentage of the amount payable for the treatment . . . under the person's charge description master in effect on January 1, 2019 or, if the person did not have a charge description master on that date, the applicable following percentage of the average amount the person charged for the treatment on January 1, 2019:

(*i*) For treatment or training rendered after July 1, 2021 and before July 2, 2022, 55%.

(*ii*) For treatment or training rendered after July 1, 2022 and before July 2, 2023, 54%.

(*iii*) For treatment or training rendered after July 1, 2023, 52.5%.

\* \* \*

(8) For any change to an amount payable under Medicare as provided in subsection (2), (3), (5), or (6) that occurs after the effective date of the amendatory act that added this subsection, the change must be applied to the amount allowed for payment or reimbursement under that subsection. . . .

\* \* \*

(15) As used in this section:

\* \* \*

(f) "Medicare" means fee for service payments under part A, B, or D of the federal Medicare program established under subchapter XVIII of the social security act, 42 USC 1395 to 1395*lll*, without regard to the limitations unrelated to the rates in the fee schedule such as limitation or supplemental payments related to

utilization,[8] readmissions,[9] recaptures,[10] bad debt adjustments,[11] or sequestration.[12]

As previously noted, this Court recently addressed the issues presented in the instant case in *Favot*, ___ Mich App at ___; slip op at 1. In *Favot*, this Court expressly rejected the argument that only the base fee schedule rate should be used. *Id*. at ___; slip op at 7-8. Instead, the Court held that the phrase "amount payable under Medicare" in MCL 500.3157 refers to the amount that Medicare would actually pay for the service, after application of all relevant Medicare payment methodologies, rules, and limitations. *Id*. at ___; slip op at 5. It clarified that, "under the plain language of MCL 500.3157(2)(a), limitations such as the [Medicare multiple-procedure payment-reduction], the packaged-service rule, and the geographic billing modifier... may be considered for purposes of the no-fault act" because they "affect the amount Medicare would pay for the particular service[.]" *Id*. Accordingly, under *Favot*, insurers must apply all Medicare payment methodologies that are related to the rates in the fee schedule. *Id*. at ___; slip op at 5. Only those limitations that are expressly "unrelated to the rates in the fee schedule" are excluded from consideration. *Id*.

Applying *Favot* to the present case, it is clear that the trial court's ruling was based on an incorrect interpretation of MCL 500.3157, as it did not apply the full Medicare payment methodology now required by *Favot*. Questions of fact thus remain as to whether the amounts paid were accurate under the proper methodology. Accordingly, the trial court erred by denying defendant's motion for summary disposition under MCR 2.116(C)(10). However, because questions remain regarding the specific amounts owed, defendant was not entitled to summary

---

[8] 42 USC 1320c *et seq*. provides for peer review of healthcare services under the Social Security Act. These reviews determine whether medical services are reasonable and medically necessary, and whether the quality of the services meet professionally recognized standards. See 42 USC 1320c-3(a)(1).

[9] The Hospital Readmissions Reduction Program, as described in 42 USC 1395ww(q), defines a readmission as "the admission of the individual to the same or another applicable hospital within a time period specified by the Secretary from the date of such discharge." 42 USC 1395ww(q)(5)(E). This program requires hospitals "to account for excess readmissions," by making a penalty payment. 42 USC 1395ww(q)(1).

[10] 42 USC 1395x(v)(1)(A)(ii) calls for regulations to "provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive."

[11] Medicare "bad debts" are Medicare coinsurance and deductible amounts that are uncollectible from the patient. In certain circumstances, adjustments to providers may be made by Medicare for such "bad debts." See 42 USC 1395oo.

[12] Sequestration is defined as "the practice of imposing automatic government spending reductions by withholding appropriations by a fixed percentage that applies uniformly to all government programs except those exempted." *Merriam-Webster's Dictionary* <https://www.merriam-webster.com/dictionary/sequestration> (accessed August 20, 2025).

disposition under MCR 2.116(C)(7). On remand, the correct reimbursement cap under MCL 500.3157(2) must be calculated by applying the full Medicare payment methodology, including all rate-related adjustments, reductions, and bundling rules, except for those limitations expressly excluded, consistent with *Favot*. *Id*. at ___; slip op at 7-8.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Anica Letica
/s/ Mariam S. Bazzi